DETERMINED IN THE

# Supreme Court of Judicature,

OF THE

## STATE OF NEW JERSEY,

AT SEPTEMBER TERM, 1822.

---

THE OVERSEERS OF THE POOR OF THE TOWNSHIP OF HOPE-
WELL *against* THE OVERSEERS OF THE POOR OF THE
TOWNSHIP OF AMWELL.

### ON CERTIORARI.

A service, under an instrument to which there was affixed no seal of wax
or wafer, but only a scroll or scribble by way of seal, is not such a serving
of an apprenticeship under indenture as will gain a settlement under the
act for the " settlement and relief of the poor."

---

This was a *certiorari* to the Court of Quarter Sessions of
the county of Hunterdon. The facts in this cause fully
appear by the state of the case sent up to this court by the
Quarter Sessions, in return to the *certiorari*, which is as
follows :

" John Carr and Jacob I. Young, esquires, two of the
justices of the peace in and for the county of Hunterdon,
made their order for the removal of Christian Brooks, and
two children (the one a male, and the other a female, aged

about one month and twenty-one days) from the township of
Amwell to the township of Hopewell, which order of removal
is hereto annexed ; under which order they were removed to
the said township of Hopewell, from which the said overseers of
the poor of the township of Hopewell appealed to the General
Quarter Sessions of the Peace of the county of Hunterdon,
which appeal came on to be heard before the said court in
the sessions of February, in the year of our Lord one thou-
sand eight hundred and twenty ; and it was thereupon tes-
tified by Mary Stackhouse, a witness produced on the part
of Amwell, and sworn, that she is the mother of the said
Christian Brooks, who will be twenty-two years old on the
fourteenth day of the present month ; that she served with
Nehemiah Saxton, in Hopewell ; that witness, having no
husband at the time, herself bound said Christian to said
Saxton, in August, eighteen hundred and ten, to serve until
she should be eighteen years of age ; that witness and said
Christian, her daughter, executed an indenture to the said
Saxton ; that there was only one indenture, which was kept
by said Saxton ; that the said Christian remained with said
Saxton until she was fourteen years and six months old,
under the indenture ; that she was there three years and a
half ; that it was mentioned in the indenture that she was
to serve six years and six months ; that said Saxton is not
now living ; that said Christian was to learn to do all kinds
of work that a girl ought to do ; that the indenture was
drawn by Joab Saxton, son of said Nehemiah ; that the
binding of the girl was at the request of the said Nehemiah
Saxton, with whom she had lived before she was bound.
And being cross-examined on the part of Hopewell, the said
Mary testified, that when, she says, she and her daughter
executed the said indenture, she means that she and her
daughter signed it ; that witness lived at Readington at the
time, and said Christian is a bastard. And being examined
again, on the part of Amwell, she testified, that the said
Joab Saxton was a witness to the said indenture ; that she

did not recollect who called on her to execute it; that she acknowledged it to be her hand and seal, and her daughter, the said Christian, did the same; that the said indenture was read over to them, and that she made a mark, but did not write her name. And it was further testified by the said Christian Brooks, a witness produced on the part of Amwell, and sworn, that she served with Nehemiah Saxton, in Hopewell, for three years after she was bound; that she was bound by her mother, and had lived there about five months before; that she, the witness, signed the indenture; that she does not recollect to have seen or signed more than one, which was left with the said Nehemiah Saxton; that, by the indenture, she was to serve until she was eighteen years of age; that the said indenture was read to them; that she left said Saxton before her time was out; that he sent her away, and she went to her mother's, and has not been bound out since; and, being cross-examined by Hopewell, she said she made a cross, and could not read nor write at the time. And it was farther testified by Joab Saxton, a witness produced on the part of Amwell, and sworn, that he was called on to write an indenture between these people and his father, the said Nehemiah Saxton, who is now dead; that the said indenture was delivered to his father, and is now lost; that said Christian was to serve until she became eighteen years of age, and did serve about three years, and had lived with his father some time before, and that his father lived in Hopewell. And, being cross-examined on the part of Hopewell, he testified, that he drew the writing in question, and there was but one; that he was present at the time it was signed, and was a subscribing witness; that there was no seal of wax or wafer to the said writing; that there was a scribble made with a pen; that there was no stipulation in the said writing, that the said Christian should be taught any thing by his father; that he drew it from an old printed indenture, and left out all that part which relates to teaching any thing; that his father was to give her a

Overseers of Poor of Hopewell *v.* Overseers of Poor of Amwell.

quarter's schooling and a freedom suit. And being again examined on the part of Amwell, he testified, that about seven years ago he had occasion to look at the said indenture, since which he had not seen it; that it was stated in it that she was to serve as an apprentice; and that he thought that the parties to it did not acknowledge their hands and seals; at the time, he did not know much of the manner in which writings should be drawn."

Upon the foregoing evidence, the cause was put to the Court of Quarter Sessions, and, after argument of the counsel of the parties, the said court did affirm the said order of removal, with costs; whereupon the counsel on the part of the appellants did pray of the court a state of the case, and thereupon the foregoing state of the case is stated, signed and sealed.

This cause was argued at May term, 1822.

*Ewing* and *Wall,* counsel for the overseers of the poor of the township of Hopewell, contended, that the order of removal of the two justices, and that of the sessions, ought to be quashed, because the settlement of Christian Brooks was not in the township of Hopewell. 1. She could gain a settlement there only by service of apprenticeship under an *indenture.* But this instrument was not an indenture; it had no wax or wafer seal. The State of New Jersey, (*Pat.* 254) making scrolls good seals, only applied to instruments for the payment of money. They cited also, on the subject of seals, 5 *John.* 244, *opinion of Kent, J.; Perkins, sec.* 129; *Coke's Inst.* 179. 2. Nor was the service a service of *apprenticeship.* The term apprenticeship, made use of in the statute, (*Pat.* 26, *sec.* 1) was a legal term, and must have a legal signification. To make a person an apprentice there must be a binding to service by deed. 1 *Burns'. Just.* 60; *Bac. Abr. letter A.* 557, *et sequente;* 2 *Ld. Ray,* 1117; *Chit. on Apprentices* 28.

It may be contended, that though there is no legal inden-
ture of *apprenticeship*, yet that a service under this instru-
ment is sufficient, as against the township, to gain a
settlement. But this is not true; the instrument is wholly
void, and cannot be set up for any purpose, or against any
person. 1. It is not good against the child. 2. It is not
good against the mother. Whatever right a father had to
bind his children, no such right existed in the mother. 1
*Black. Com.* 453; 4 *Bur.* 487, 492. The children here
were bastards, but that does not alter the position. In 1
*Swift's System* 208, it is said, " the father of a bastard child
has no power or authority over him" *a fortiori*, the mother
has none. The act of 1798, (*Pat.* 305) only gives the mother
authority to bind in case of the death of the father. 3. It
is not good against Saxton. 4. The instrument is not good,
as against the township. There are some cases in *Burrow*
where a settlement has been obtained by apprenticeship,
although the indenture was defective. But, in these cases,
it was decided, that the indenture was voidable only, and
not void. No case can be produced, where a settlement has
been gained by a service under a writing without seal, or
an instrument which is void. It has been repeatedly
decided, that although there may be an agreement, and
a service under it, yet it will not gain a settlement. *Bur-
row's Settlement Cases* 272, 540, 656. We may be referred
to two cases in this court, *viz.*, that of *Hopewell* v. *Amwell*,
1 *Pen. Rep.* 421, and that of the *Township of Franklin*
v. *South Brunswick*, *Ib.* 442. In the first, there was a
writing executed by the father; and the objection was, that
the child did not sign it. There was a regular valid instru-
ment, and the father, who was entitled to the service of the
child, had contracted. The instrument was valid, as to all
except the child. The other case was, where the pauper was
bound out by the overseers of the poor and two justices of
the peace, under the 18th section of the act, (*Pat. N. J.
Laws* 31). And it was objected, that the justices were not

together when the indenture was made, and, therefore, that the indenture was void. But the court determined, that the indenture was good. Judge Pennington intimates, that a service under a voidable indenture would gain a settlement, but he surely never intended to say that a service under a void indenture could gain a settlement.

*Bonnel* and *Vroom,* contra, contended, that there was such a service of *apprenticeship* under this instrument as to gain the pauper a settlement in the township of Hopewell. The statute relative to the settlement of the poor (they said) should be construed liberally; their object was to further the purposes of humanity. *Chit. on Apprentices, Preface* 15. According to the common law, it appeared there could be no apprenticeship, unless there was a particular trade to be learned. But the strictness of the common law had not been followed up in modern courts, and was done away by acts of the legislature. *Burrow's Settlement Cases* 657. The act of New Jersey, 1774, (*Pat.* 26) was to be construed by the common law which was then in force; and, by the common law, this service was to be considered as an *apprenticeship,* because the father could not legally bind his child as a servant. This indenture, by the common law, was not void, but voidable only, and if it be not avoided by the apprentice or child the township or master cannot avoid it. Though this instrument was not strictly an *indenture* at common law, because it had no seal of wax or wafer, yet the want of a seal was not such a defect as to make it void, so that the township could take advantage of it. Seals had their origin in the ignorance of mankind, when men were unable to evidence their contents by writing. The definition of a seal is *cera impressio, et sine impressione non est sigillum.* And the reason given for allowing the jury to take a deed out with them, is, that being from the neighborhood, some of them might be supposed to know the impression of the seal. 1 *Wash. Rep.* 42; 5 *Bin.* 241.

But now there is seldom any impression on the seal, and none by which the seal of one man can be distinguished from that of another; therefore, as the reason of the law does not now exist, the law itself ought to cease. When an indenture has been executed by the parties, and all the essential requisites are combined, the court will not, in a settlement case, look at mere matters of form. By the statute 5 Elizabeth, it is enacted, that there shall be a binding for seven years, or it will be absolutely void, yet a binding for four years, under this statute, was held a good binding to gain a settlement. 3 *Burns' Just.* 384–5. *Chit. on Apprentices* 35. A service under a person who has no title to the service of the apprentice, or servant, will be good against the township. 3 *Burns' Just.* 406.

In 1 *Pen. Rep.* 422, there was no binding on the part of the apprentice; he did not sign the instrument, and yet it was held good against the township; and in the case of *the King* v. *the Inhabitants of St. Nicholas, Bur. Settlement Cases* 91, though the master did not execute the instrument, it was held sufficient to gain a settlement for the apprentice. 3 *Burns' Just* 384. From our statute, (*Pat.* 305) it appears as if these defects ought not to be taken advantage of by any other person than the party. This act recognizes the doctrine of the common law. It merely requires the assent of the guardian, which must be given in a particular manner. He is merely a person standing in *loco parentis*, in such a way as to see that no advantage is taken of the child. It is not necessary that the guardian should take upon himself any binding covenant.

It has been said, that the mother has no power to bind her bastard child; although this case does not come within the very letter, surely it is within the spirit of the act. It is a mere *casus omissus*. But if she is not such a mother as may bind her child, yet she may do it as guardian, for she is the natural guardian of the child; and this binding,

by the mother, was sufficient to bind the township; therefore, they trusted the order of the justices and of the Quarter Sessions would be affirmed.

*Curia advisare vult.* And now, at this term, the Chief Justice delivered the opinion of the court.

KIRKPATRICK, C. J. It appears, by the return of this writ, that there was an order of two justices to remove Christian Brooks, a pauper, with her two children, from the township of Amwell, in the county of Hunterdon, to the township of Hopewell, in the same county; that there was an appeal from this order to the Court of General Quarter Sessions of the Peace of that county; and that upon the hearing of the appeal, the order was affirmed, with costs.

It appears further, from the case stated by the Sessions, that this Christian Brooks was the daughter of one Mary Stackhouse, and was born a bastard; that she was bound by her mother to one Nathaniel Saxton, of the said township of Hopewell, for the term of six years and six months, to common service, and served him there for three years and a half of that time; that this binding was, in its form, by a certain writing called an indenture, which was executed by both the pauper and her mother, each of them making her mark thereto, and acknowledging it to be her hand and seal; but there was, in fact, no seal, either of wax or wafer, affixed to the said writing, *but a scribble made with a pen only.* And the question is, whether this be such a serving of apprenticeship under indenture as will gain a settlement under the act for the settlement and relief of the poor? The objection is, that the writing was not sealed, and that, therefore, it could not be an indenture, nor the service under it be a service under indenture, which, alone, is sufficient under the act.

An indenture, in the language of the law, is a deed, that is, a writing *sealed* and *delivered.* It takes its name from

its being indented or cut, on the top or on the side, either by a waving line or a line of indenture, *instar dentium,* so as to fit or aptly join its counterpart, from which it is supposed to have been separated. Besides this general understanding of the law, our act respecting apprentices and servants expressly provides, that the indenture of apprenticeship or service shall be *sealed.* When the act for the settlement of the poor, therefore, speaks of gaining a settlement by service of apprenticeship *under indenture,* it must necessarily mean such indenture as the law prescribes, an indenture *sealed.* We are to inquire, therefore, what the law means by a *seal,* or a writing *sealed.*

There has been a good deal of speculation in the courts of some of these states upon this subject. They have investigated *with profound learning,* the nature, origin and utility of seals, and of what a seal must consist; and some of them have made the *wonderful discovery,* that a seal may be not only without any distinct impression, but also without wax, or anything in the nature of wax, or in any way susceptible of impression. To have said, that sealing should not be necessary to constitute a deed, but that the subscription of the name only should be sufficient for that purpose, would have had some foundation in reason, however little it might have in the law, to support it; but to say, that a writing is sealed without any thing affixed to it in the nature of a seal, is a little like Lord Peter's saying, that his brown loaf was as fine a leg of mutton as ever came out of the Leaden Hall market; and, I think, must be received pretty much upon the same kind of authority. "G. *Confound you all eternally, and gripe your guts with hunger if you offer to believe otherwise.*"

By our act concerning obligations, &c., it is enacted, that any instrument *for the payment of money* to which the person making the same shall affix *a scroll, or ink, or other device,* by way of seal, shall be taken and adjudged to be of the same force and obligation as if it were actually sealed

Overseers of Poor of Hopewell *v.* Overseers of Poor of Amwell.

with wax; thus fully recognizing the principle, which common sense had before taught to all men, that wax, or something in the nature of wax, and susceptible of receiving an impression, is necessary to constitute a seal, but dispensing with such seal in the case of *instruments for the payment of money.* The act does not say, that a *scroll* or *ink,* or other device affixed, *shall be a seal,* but, that being affixed, *by way of seal,* they shall have the same force and obligation as a seal. This, however, is only in the case of *instruments for the payment of money,* of which an indenture of apprenticeship is not one. In all other cases it is left as at the common law. The instrument before us, therefore, can, in no sense known to the law, be called an indenture.

But then it is said, that inasmuch as it is in the form of an indenture, and was, by the parties, understood to be an indenture; and inasmuch as the service, which is an essential thing in gaining a settlement, was actually performed under it, it does not lie in the mouth of the township now to except against it; that it was not void, but voidable only, and, being so, it could be avoided by the parties alone, and not by third persons.

It is true, that in England this doctrine has been maintained to a certain extent. As where the indenture has been for a shorter time than that prescribed by the statute; and where the apprentice only has signed the indenture, and not the parent or guardian, or even the master; and in some other cases of a similar nature, in which, though the statute says the indenture shall be void to all intents and purposes, yet it has been adjudged, that it was not absolutely void, but voidable only, at the election of the parties themselves, if they thought fit to take advantage of it, but not of third persons, and that, therefore, serving under indentures of this kind gained a settlement. In these cases, however, it was *a serving under indenture* within the words of the statute, for though the indentures were voidable, yet they were not void, but subsisting indentures until avoided by the parties.

But there is no case to be found in the books where the service of an apprenticeship under a parol agreement, or under any instrument of writing, not being an indenture sealed, has been adjudged to be sufficient to gain a settlement. And the reason is, that the statute expressly requires *a service under indenture*. In the case of the *King* v. *Mellingham*, the writing, though otherwise in the form of an indenture, was not actually *indented*, and it was adjudged in the King's Bench, that no settlement could be gained under it. And it has been thought necessary, both in England and here, to remedy this by statute, and to declare that no deed, contract or writing, for binding any one an apprentice or servant shall be void by reason of its not being indented only. And if this be so as to the indenting, which is but mere matter of form, how much more so as to the sealing, which is the very essence of the thing.

I am of opinion, therefore, that the order of Sessions, as well as the order of the justices in this case, be quashed.